**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**John L. SWEET et al.,
Defendants-Appellants.**

**Nos. 76–1366, 76–1379, 76–1387.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 30, 1976.

Decided Jan. 17, 1977.

Rehearing Denied Feb. 16, 1977.

Certiorari Denied April 18, 1977.
See 97 S.Ct. 1653.

Lawrence E. Morrissey, Charles R. Purcell, Morton E. Friedman, Kenneth L. Cunniff, Chicago, Ill., for defendants-appellants.

Samuel K. Skinner, U. S. Atty., Patricia W. Lemley, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before FAIRCHILD, Chief Judge, CASTLE, Senior Circuit Judge, and WOOD, Circuit Judge.

HARLINGTON WOOD, Jr., Circuit Judge.

The major issue is whether Congress in enacting 18 U.S.C. § 844(i)[1] has exceeded its permissible reach into local matters under the Commerce Clause of the Constitution of the United States as applied to the facts of this case. We think not.

On August 28, 1975, the defendants, John L. Sweet, Henry D. Hollowell and James C. Hogan, were charged in a four count indictment with conspiring to destroy a tavern and its contents (Count I); Hollowell and Hogan with unlawful making and possession of fire bombs (Counts II and III); and all three defendants with malicious destruction of a tavern by means of an explosive (Count IV), in violation of 18 U.S.C. §§ 371 and 844(i) and 26 U.S.C. § 5861(d) and (f). The jury found all three defendants guilty of Count I, Hollowell and Hogan guilty of Counts II, III and IV. Sweet was acquitted on Count IV.[2]

The factual background may be briefly stated. Two competing taverns, Uncle John's Country Inn, owned by Sweet, and Saso's Lounge, were located across the

---

1. 18 U.S.C. § 844(i) provides in part:

(i) Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned for not more than ten years or fined not more than $10,000, or both; and if personal injury results shall be imprisoned for not more than twenty years or fined not more than $20,000, or both; and if death results shall also be subject to imprisonment for any term of years, or to the death penalty or to life imprisonment as provided in section 34 of this title.

2. Sweet was sentenced to a period of four years; Hollowell to five years on both Counts I and IV to run consecutively, followed by three years probation to run concurrently on Counts II and III; Hogan to three years on both Counts I and IV to run consecutively, followed by three years probation on Counts II and III to run consecutively.

street from each other in Godley, Illinois. Sweet offered $2,000 to eliminate his competition by dynamite and Hollowell and Hogan accepted the offer. By a combination of whiskey bottles filled with gasoline, railroad flares and bricks, Hollowell and Hogan bombed and burned Saso's out of business on April 15, 1976. Lost with the tavern building were its stocks of liquor and beer originating out of state but purchased locally through distributors.

## I.

Defendants do not challenge the proof of the conspiracy or sufficiency of the evidence, but argue that the substantive statute § 844(i) as applied to this affair between two local taverns is beyond the power of Congress and thus, the convictions on Counts I and IV must fall.

It is conceded that the destroyed building and alcoholic beverages were not "used in interstate or foreign commerce," but the question raised by defendants is whether the property was used in an activity "affecting" interstate commerce within the terms of the statute. Defendants say that the use of the commerce clause by the federal government as an inroad into local matters has already gone as far as it can or should go.

Only one case has directly sustained the validity of § 844(i) under the commerce clause, but defendants argue that it is not in point because of factual distinctions. There the property bombed was a commercial fishing boat which shipped its catch interstate and was thus, the defendants argue, itself an instrumentality of interstate commerce. *United States v. Keen*, 508 F.2d 986 (9th Cir. 1974), *cert. denied*, 421 U.S. 929, 95 S.Ct. 1655, 44 L.Ed.2d 86. That case relied on *Perez v. United States*, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971), which to some extent the Government relies on here.

In *Perez, supra*, the contention was likewise made that the statute, 18 U.S.C. § 891, *et seq.*, was unconstitutional on grounds that Congress had no power under the commerce clause to control local loan sharking

as an activity affecting interstate commerce. That court had the benefit of congressional findings set forth in the act to the effect that there was a tie-in between local loan sharks and interstate crime. We do not have the benefit of such findings. However, the congressional purpose of 18 U.S.C. § 844(i), is explained in the following excerpts from the legislative history, House Report No. 91–1549, Organized Crime Control Act of 1970, 1970 U.S.Code Cong. & Ad.News:

> Bombings and the threat of bombings have become an ugly, recurrent incident of life in cities and on campuses throughout our Nation. The absence of any effective State or local controls clearly attest to the urgent need to enact strengthened Federal regulation of explosives.
>
> \*   \*   \*   \*   \*   \*
>
> Its purpose is to protect interstate and foreign commerce against interference and interruption by reducing the hazards to persons and property arising from explosives misuse and unsafe or insecure storage. It is also intended to assist the States effectively to regulate explosives distribution within their borders.   .   . (P. 4013)
>
> \*   \*   \*   \*   \*   \*
>
> Section 844(i) proscribes the malicious damaging or destroying, by means of an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce. Attempts would also be covered. Since the term affecting [interstate or foreign] "commerce" represents "the fullest jurisdictional breadth constitutionally permissible under the Commerce Clause," *NLRB v. Reliance Fuel Corp.*, 83 S.Ct. 312, 371 U.S. 224, 226, 9 L.Ed.2d 279 (1963), this is a very broad provision covering substantially all business property. While this provision is broad, the committee believes that there is no question that it is a permissible exercise of Congress authority to regulate and to protect interstate and foreign commerce. (P. 4046)

The long reach of the enactment into matters which in some other context might be regarded as local was obviously intended, but we do not believe the Congress has overreached its power.

> The commerce power is not confined in its exercise to the regulation of commerce among the states. It extends to those activities intrastate which so affect interstate commerce, or the exertion of the power of Congress over it, as to make regulation of them appropriate means to the attainment of a legitimate end, the effective execution of the granted power to regulate interstate commerce. *United States v. Wrightwood Dairy Co.*, 315 U.S. 110, 119, 62 S.Ct. 523, 526, 86 L.Ed. 726 (1942).

Holding that wheat grown only for home consumption and never marketed interstate was subject to federal regulation because it supplied the need of the producer, which need would otherwise have been satisfied by purchases in the open market, the Court said:

> But even if appellee's activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce, . . . . *Wickard v. Filburn*, 317 U.S. 111, 125, 63 S.Ct. 82, 89, 87 L.Ed. 122 (1942).

The reach of § 844(i) in this case is not that far, but by analogy it could apply to a tavern bombing even though the alcoholic beverages served had not only been served but produced on the local premises.

In a civil rights case involving a local restaurant serving food, some of which had moved interstate, the Court again said:

> It goes without saying that, viewed in isolation, the volume of food purchased by Ollie's Barbecue from sources supplied from out of state was insignificant when compared with the total foodstuffs moving in commerce. But, as our late Brother Jackson said for the Court in *Wickard v. Filburn*, 317 U.S. 111 [63 S.Ct. 82, 87 L.Ed. 122] (1942):

> > "That appellee's own contribution to the demand for wheat may be trivial by itself is not enough to remove him from the scope of federal regulation where, as here, his contribution, taken together with that of many others similarly situated, is far from trivial." At 127–128 [63 S.Ct. at 90].

> *Katzenbach v. McClung*, 379 U.S. 294, 300–1, 85 S.Ct. 377, 382, 13 L.Ed.2d 290 (1964).

In a Sherman Act case the Court summed up the problem and its answer:

> The trial court appears to have dismissed the case chiefly on the ground that the accused Association and its members were not themselves engaged in interstate commerce. This may or may not be the nature of their operation considered alone, but it does not matter. Restraints, to be effective, do not have to be applied all along the line of movement of interstate commerce. The source of the restraint may be intrastate, as the making of a contract or combination usually is; the application of the restraint may be intrastate, as it often is; but neither matters if the necessary effect is to stifle or restrain commerce among the states. If it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze. *United States v. Women's Sportswear Ass'n*, 336 U.S. 460, 464, 69 S.Ct. 714, 716, 93 L.Ed. 805 (1949).

Recent Hobbs Act[3] decisions of this circuit are also helpful. See *United States v. Staszcuk*, 517 F.2d 53 (7th Cir. *en banc* 1975), *cert. denied*, 423 U.S. 837, 96 S.Ct. 65,

---

**3.** 18 U.S.C. § 1951 (Hobbs Act) provides in part:

> (a) Whoever in any way or degree obstructs, delays, *or affects commerce* or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or

threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both. (Emphasis added.)

46 L.Ed.2d 56; *United States v. Braasch*, 505 F.2d 139 (7th Cir. 1974), *cert. denied*, 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775; *United States v. Gill*, 490 F.2d 233 (7th Cir. 1973), *cert. denied*, 417 U.S. 968, 94 S.Ct. 3171, 41 L.Ed.2d 1139. In *United States v. DeMet*, 486 F.2d 816 (7th Cir. 1973), *cert. denied*, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974), this court considered the application of the Hobbs Act to extortion by police officers from the owner of a cocktail lounge, where, as in the present case, some of the alcoholic beverages had moved interstate. The court in upholding the use of that Act in those circumstances stated that "Because Congress has seen fit to exercise its full power under the commerce clause, extortionate conduct having an arguably *de minimis* effect on commerce may nevertheless be punished." The defendants seek to avoid these cases by arguing that they focus on whether the extortion interfered with commerce as distinguished from affecting interstate commerce. Both statutes punish unlawful acts which affect commerce. The effect on commerce was the concern of *DeMet*. In holding as we do, we are, therefore, not stretching federal jurisdiction as defendants argue. Any stretching that there may have been in this area was long ago accomplished. Nor do we discount the wisdom of some restraint succinctly enunciated in Mr. Justice Stewart's dissent in *Perez, supra*.

■ The punishment in § 844(i) of the unlawful use of explosives in an intrastate activity, but which has an effect on inter-

state commerce although *de minimis*, is within the power of Congress to enact as an appropriate means to accomplish a legitimate end under the commerce power.

## II.

The remaining issues raised by the defendants will be briefly considered individually.

■ Relying on an instruction approved in *United States v. Hyde*, 448 F.2d 815 (5th Cir. 1971), *cert. denied*, 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745,[4] to illustrate the claimed weaknesses of the instruction given in this case, the defendants argue that the court in effect directed a verdict for the Government on the commerce issue.[5] The defendants recognize that it is a function of the court to determine as a jurisdictional matter whether or not interstate commerce has been affected, if the jury finds the underlying facts to have been established. *United States v. Kuta*, 518 F.2d 947 (7th Cir. 1975), *cert. denied*, 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385.

■ The two instructions approach the problem differently. In *Hyde*, a more complicated case, no effort was made to enumerate in the instruction the interstate commerce facts first needed to be found by the jury before the court's finding as to jurisdiction was applicable, as was done in the present case. *Hyde* notes without disapproval that a number of courts have approved the approach used by the trial judge

4. The court in *Hyde*, a Hobbs Act case, instructed in part:

As to Count Four, I charge you that if you find one or more of the defendants named in this count to be guilty from the evidence presented to you, beyond a reasonable doubt, the Court has found, as a matter of law, that the evidence in connection with Count Four, if believed, meets the requirements of Title 18, Section 1951, United States Code, insofar as the conduct of the defendants having affected interstate commerce, and thereby sustaining the Court's jurisdiction within the scope of the Hobbs Act.

5. The instruction given in the present case is:

"Interstate or foreign commerce" means commerce between any place in a state and

any place outside of that state, and commerce between places within the same state but through any place outside of that state.

If you find beyond a reasonable doubt that Saso's Lounge was a tavern engaged in the retail sale of alcoholic beverages shortly before April 15, 1975, and if you further find beyond a reasonable doubt that some of the alcoholic beverages sold by Saso's Lounge had previously been purchased outside the State of Illinois by the distributor who sold to Mr. Saso, then I instruct you as a matter of law that the building housing Saso's Lounge and the personal property therein were being used "in an activity affecting interstate and foreign commerce" as defined in Section 844(i) of Title 18, United States Code.

here when the facts supporting the interstate commerce aspect of the case were fairly simple, citing as an example *Hulahan v. United States*, 214 F.2d 441 (8th Cir. 1954), *cert. denied*, 348 U.S. 856, 75 S.Ct. 81, 99 L.Ed. 675. We believe the more specific instruction used here has merit, particularly in a simple case, as it helps the jury focus upon the necessary facts giving rise to jurisdiction and eliminates any possible confusion. The "if believed" phrase inserted in the *Hyde* instruction was not used in the instruction in this case. That phrase is not needed as the court instructed the jury that an effect on interstate commerce would exist as a matter of law only if the jury first found the specific commerce facts to have been established beyond a reasonable doubt. The court's other instructions informed the jury that its function is to determine the facts and that the jury alone is the sole and exclusive judge of the facts. We find no error in the instruction.

### III.

The defendants next contend that the Government failed, in violation of the requirements of *Brady*[6] as interpreted in *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), to produce the exculpatory statement of a witness named McConahay who testified for defendant Sweet and for the Government on rebuttal. The material was made available to the trial court for *in camera* inspection and then sealed by the court after reaffirming the Government's position. Both parties assumed in their briefs that this sealed material was part of the record and available on appeal for inspection. It was not, but has been made a supplement to the record by order of this court, and was thereafter examined.

■ This material consists of two statements of the witness and one Report of Interview by a Special Agent, together with what appear to be the Agent's original notes of the interview. The statements are generally the same, but vary in some respect with more details on certain aspects. The motion for these statements was made under *Brady*, but not renewed as a Title 18, § 3500 motion when the witness was called by the Government. It is not clear, but it appears from the transcript that at various times during the examination or cross-examination of the witness these statements may have been used in court and made available to defense counsel. The witness was called by the defense and later by the Government in rebuttal and subjected to both direct and cross-examination by all parties. The matters contained in the sealed documents were thoroughly explored. The witness had been previously interviewed by the defense and its investigator. McConahay can hardly be classified as a witness unsympathetic to the defense as he testified that he rode to court with Defendant Sweet wearing one of his neckties.

We find nothing exculpatory in the statements and no error in their nonproduction under these circumstances.

### IV.

■ The defendant Sweet in his defense offered the testimony of a polygraph examiner which the court in its discretion refused to receive. The defense recognizes that this court has previously held the admissibility of polygraph testimony to be within the discretion of the trial judge,[7] but argues that the court's discretion was abused in this case. Nor are other circuits willing to embrace such testimony. *United States v. Alexander*, 526 F.2d 161 (8th Cir. 1975).

We find no abuse of discretion.

### V.

■ Next the defense claims that the Government breached an agreement not to call a witness named Kreml to whom, the

---

6. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

7. *United States v. Chastain*, 435 F.2d 686 (7th Cir. 1970); *United States v. Infelice*, 506 F.2d 1358 (7th Cir. 1974), *cert. denied*, 419 U.S. 1107, 95 S.Ct. 778, 42 L.Ed.2d 802.

Government claimed, the defendant Hogan had made inculpatory statements. The Government, after about a day's advance notice at which time the Jencks statement was provided to the defense, called Kreml over the objection of the defendants. We find nothing in the record to substantiate an agreement binding on the Government as was the situation in *United States v. Scanland*, 495 F.2d 1104 (5th Cir. 1974), relied upon by defendants. In that case there was a pretrial agreement recorded in an Omnibus Hearing Report signed by all counsel. Even under those circumstances that court expressly refused to diminish the sound discretion of the trial judge to grant releases from such agreements upon reasonable notice.

We find no abuse of the trial judge's discretion.

### VI.

The defense claims that it was error not to grant a motion for mistrial when a Government witness during direct examination made reference to defendant Hollowell's prior record. In response to a question as to what the defendant Hollowell had said to him about the firebombing, the witness responded:

> He asked me that—he heard that I was going to tell the cops what happened. I told him that—he also told me—he said that anyone that attempted—he said his life had been messed up once by a prison term. He said that if anybody tried to send him up again, or testify against him on anything he had done, he would kill them.

It appears that this was a reference to a prior juvenile offense. The trial court thereafter instructed the jury that the witness' statement "made with respect to any prior prison term by the defendant Hollowell was incorrect. He was misinformed. Therefore, you should not consider that. It has been stricken from the record. It is something that doesn't exist as far as this case is concerned." As a rationale for this instruction the court reasoned that since the offense alluded to was a juvenile offense and could not be used in the trial for any purpose, the court thus would not be misleading the jury by using the form of the instruction given. That may be, but we recommend, when required, that a straightforward instruction to disregard be given, incorporating therein nothing beyond the facts. Such an instruction as suggested may not always be as effective as the one given in this case, but it will eliminate the possibility that the jury may have cause to believe that the judge, even though well intentioned, misled them. There is no reason to believe that the jury did not follow the instruction. The matter was not again alluded to during trial. Incorporated in the trial judge's final instruction to the jury was the further admonition that the defendants were not on trial for any act or conduct not alleged in the indictment and that testimony which the court had ordered stricken from the record did not constitute evidence and was not to be considered by the jury.

We find no prejudice to the defendants after the court's instruction and no error.

We affirm.